**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Mark Mandeville

        v.                                              Civil No. 05-cv-092-PB

Carole Anderson, et al.[1]

**<u>REPORT AND RECOMMENDATION</u>**

Proceeding *pro se* and *in forma pauperis*, Mark Mandeville
filed a complaint (document no. 4) under 42 U.S.C. § 1983
alleging that during his pretrial incarceration at the Merrimack
County House of Correction ("MCHC")[2] he was denied a number of
his constitutional rights by MCHC employees, including, among
others, his right to adequate medical care, his right to humane

---

[1]Mandeville names the following eleven Merrimack County
House of Corrections employees or subcontractors as defendants to
this action: Superintendent Carole A. Anderson, Assistant
Superintendent Richard Doucette, Captain Croft, Sargeant
Jardullo, Sargeant Robinson, Corporal Stalker, Corrections
Officers Prentiss and Twining, Nurse Carol French, Physician's
Assistant Henry Symonds, and Dr. James Trice.  In addition to
these named defendants, Mandeville has asserted claims against
the following defendants in the body of his complaint: Nurses
Glynnis Poisson and Judy Figueroa, Sargeant Struven, and
Corrections Officers Saucier, Mayo, Lewko, Unite and Andrade.

[2]Mandeville is now an inmate at the New Hampshire State
Prison.

conditions of confinement, and his right to be protected from harm during his incarceration.  The complaint is before me for preliminary review to determine whether, among other things, it states any claim upon which relief may be granted.  See 28 U.S.C. § 1915A; United States District Court for the District of New Hampshire Local Rule ("LR") 4.3(d)(2).

### Standard of Review

Under this Court's local rules, when an incarcerated plaintiff commences an action *pro se* and *in forma pauperis*, the magistrate judge is directed to conduct a preliminary review and to prepare a report and recommendation determining whether the complaint or any portion thereof should be dismissed because:

> (i) the allegation of poverty is untrue, the action is frivolous, malicious, or fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief under 28 U.S.C. § 1915A(b); or
>
> (ii) it fails to establish subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

LR 4.3(d)(2).  In conducting the preliminary review, the Court construes *pro se* pleadings liberally.  See Ayala Serrano v. Lebron Gonzales, 909 F.2d 8, 15 (1st Cir. 1990) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976) to construe *pro se* pleadings liberally in favor of the *pro se* party).  "The policy

2

behind affording *pro se* plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled." <u>Ahmed v. Rosenblatt</u>, 118 F.3d 886, 890 (1st Cir. 1997), <u>cert. denied</u>, <u>Ahmed v. Greenwood</u>, 522 U.S. 1148 (1998).

At this preliminary stage of review, all factual assertions made by the plaintiff and inferences reasonably drawn therefrom must be accepted as true.  <u>See Aulson v. Blanchard</u>, 83 F.3d 1, 3 (1st Cir. 1996) (stating the "failure to state a claim" standard of review and explaining that all "well-pleaded factual averments," not bald assertions, must be accepted as true).  This review ensures that *pro se* pleadings are given fair and meaningful consideration.  <u>See Eveland v. Dir. of C.I.A.</u>, 843 F.2d 46, 49 (1st Cir. 1988).

<u>Background</u>

Mandeville was held as a pretrial detainee at the MCHC between February 17, 2001 and March 20, 2003.  He alleges that during that time he was denied appropriate care and treatment for serious medical problems, he was abused and harassed by the correctional staff, he was denied the basics of personal hygiene, he was frequently denied the use of a wheelchair even though he

3

was unable to walk, and he was made to suffer unconstitutionally inhumane conditions of confinement.

Facts Regarding Medical Care

When Mandeville arrived at the MCHC, he was initially housed in "The Hole," a day room often used as punitive housing at the jail.  Within two weeks of his arrival, Mandeville fell while trying to get into his top bunk.  Mandeville states he woke up on the floor in a pool of blood from a profusely bleeding head wound.  Mandeville attempted to contact correctional staff by pushing an intercom button.  When he got no response after one minute, he pushed the buzzer again.  The officer who answered the intercom threatened to write Mandeville up for a disciplinary violation for pressing the button too many times.  Several more minutes passed until an officer finally inquired to see what the problem was.  Mandeville explained the situation and was told to wait.  A full hour later, officers arrived to take Mandeville to the infirmary, where the wound on his head was closed by the nurse with butterfly bandages and gauze pads.

During the late fall and winter of 2001, Mandeville alleges that he was forced by correctional staff to move into a bed that had recently been vacated by an inmate known to have scabies.

4

Although the officers allowed Mandeville to briefly clean and mop the cell before he moved into it, he immediately became infected with scabies himself.  The nurses improperly diagnosed the scabies as a rash and prescribed oral antibiotics.  The incorrect diagnosis and treatment resulted in Mandeville not being able to sleep well, concentrate, relax or function normally for approximately three months until the situation was properly diagnosed.

On April 3, 2002, Mandeville was experiencing severe pain in his hip and had a mask-like butterfly-shaped area of flaking skin on his face.  Mandeville saw a nurse who told him he might have lupus, which became the MCHC medical staff's working diagnosis of Mandeville's condition for seven weeks.  As a result, Mandeville's actual diagnosis, arthritis, was not properly diagnosed or treated in a timely manner, and his pain became excruciating as a result.  Mandeville's knees, hands and feet swelled significantly, and all of his fingernails and toenails fell off.  It became almost impossible for Mandeville to walk due to the pain in his knee and hip joints, and he became virtually immobilized without the use of a wheelchair.

On April 9 and 10, 2002, Mandeville finally had blood work

done and x-rays taken.  He was denied hot packs, ibuprofen, and Ultrim, another pain medication, during that week.  On April 14, 2002, an unnamed correctional officer threatened Mandeville with a disciplinary write-up if he asked for a wheelchair to go to med call.  On that date, at his 12:30 med call Nurse Carol French denied plaintiff Ultrim.  Again at his 9:30 p.m. med call, Nurse Glynnis Poisson refused to give Mandeville ibuprofen.  Mandeville asserts that the nursing staff withheld his pain medications for the remainder of April and part of May 2002.

During early May of 2002, Mandeville's condition worsened. Mandeville was prescribed Ultrim at each med call and ibuprofen as needed.  Mandeville was by this time completely disabled and wheelchair-bound.  On May 13, 2002, French saw MCHC physician's assistant Henry Symonds give Mandeville four ibuprofen.  French then issued orders that Mandeville was to get ibuprofen only at midnight, which prevented Mandeville from getting any ibuprofen at all as there was no med call at midnight, and no member of the corrections staff was willing to bring Mandeville to the infirmary at midnight.  At around the same time, French also reduced Mandeville's Ultrim dosage.

On May 22, 2002, Mandeville was taken to see Dr. Trice, who

diagnosed him with severe arthritis.  Trice prescribed a drug
called Methotrexate.  Mandeville claims that Trice should have
ordered weekly blood tests as follow-up monitoring to insure that
Mandeville didn't suffer from excessive bone-marrow loss, a
common side effect of Methotrexate.

After seeing Dr. Trice, Mandeville began to experience daily
fevers averaging 101 degrees and significant weight loss in a
short period of time.  On June 2, 2002, Mandeville vomited all
night long but received no medical attention.

On June 21, 2002, Symonds ordered that Mandeville was to be
provided with ibuprofen and hot packs to treat his pain and
swelling at each med call.  On June 22, 2002, at Mandeville's
7:30 a.m. and 12:30 p.m. med calls, Nurse French refused to give
Mandeville hot packs.

On June 23, 2002, Mandeville was taken to the hospital with
a fever of 106 degrees.  The hospital did blood tests and a lower
gastrointestinal series which revealed that Mandeville had a
suppressed bone marrow level.  The doctors at the hospital
prescribed a host of medications, including: Oxycontin for pain,
Cytotec for ulcer prevention, Pepsid for acid reflux, Asisaid for
arthritis, Nu-Iron for anemia, Prevacid for stomach upset and

Leucovain to replace or supplement the Methotrexate.

Mandeville was returned to MCHC on June 27, 2002 with orders that he be able to receive medications in his cell.  On that date, French came to his cell to give him medications and take his temperature, but refused to give him hot packs.  On July 13, 2002, French refused to give Mandeville all of his medications and accused Mandeville of having a bad attitude toward recovery for skipping a dose of Methotrexate the day before in an effort to reduce his vomiting.

On September 5, 2002, Mandeville was taken to the hospital for a blood transfusion occasioned by anemia that resulted from the destruction of his bone marrow.  Mandeville asserts that the bone marrow loss was caused by the Methotrexate and the failure to properly monitor Mandeville's condition.

On October 6, 2002, Nurse Judy Figueroa forgot to order Mandeville's Oxycontin and blamed her oversight on another nurse. Instead, Figueroa gave Mandeville Tylenol.  This resulted in Mandeville experiencing horrific pain as well as severe withdrawal symptoms.

Facts Regarding Access to a Wheelchair and Related Issues

Inmates at the MCHC were routinely locked down for up to

twenty-nine hours at a time, with four hour intervals of "out-time." On a number of occasions, Mandeville was denied the use of a wheelchair during out-times, which effectively denied him out-of-cell time granted to inmates who were able to walk. These denials resulted in the denial of Mandeville's ability, on those occasions, to phone his family and to engage in other activities available to inmates who could walk.

On April 14, 2002, Mandeville was denied the use of a wheelchair during forty minutes of out-time. On May 15, 2002, Mandeville requested the use of a wheelchair for his 9:30 p.m. med call. At French's direction, the wheelchair was denied and Mandeville was forced to crawl on the floor to get his medications while inmates laughed at him and the corrections officer on duty and French watched. French then refused to provide Mandeville's medication and instead directed officers to get a wheelchair and bring Mandeville to the reception area near the infirmary. Once there, French proceeded to berate Mandeville while correctional staff surrounded him. French demanded that Mandeville stand and walk to her in order to get his meds, and threatened that he would be sent to "The Hole" without his medications if he did not follow her instructions. Mandeville

9

was forced to hobble over to French in order to get his
medication.

On June 27, 2002, French denied Mandeville the use of a
wheelchair.  On July 2, 2002, Sgt. Struven denied Mandeville the
use of a wheelchair.

On August 19, 2002, Mandeville's attorney called to discuss
Mandeville's court appearance scheduled for the next day.
Mandeville was denied a wheelchair, however, and was unable to
take the call.

On August 20, 2002, Mandeville was denied a wheelchair
during his entire out-time.  On August 30, 2002, Mandeville was
denied a wheelchair for ninety minutes.  Sgt. Jardullo denied
Mandeville the use of a wheelchair from September 2 to September
3, 2003.  On September 5, 2002, C.O. Prentiss denied Mandeville a
wheelchair for four hours.  On September 7, 2002, C.O. Saucier
denied Mandeville a wheelchair for more than two and a half hours
during out-time.  On September 11, 2002, Mandeville was denied a
wheelchair for ninety minutes of out-time.  On September 14,
2002, Mandeville was denied a wheelchair for all of out-time.  On
September 19, 2002, Mandeville was denied a wheelchair in time to
call his attorney prior to his September 20, 2002 court

10

appearance.  On September 22, 2002, Mandeville was denied a wheelchair for 55 minutes of out-time.

Mandeville would often receive a wheelchair to take a shower but have it taken while he was still using it.  On September 24, 2002, Mandeville was given a wheelchair, which was then taken for an hour and returned for med call, only to be taken again while Mandeville was in line for his medication.

On Septmber 27, 2002, Mandeville was brought a wheelchair two hours into out-time.  On October 2, 2002, Mandeville was denied a wheelchair for an hour.  On October 4, 2002, officers Twining, Jardullo and Stalker forced Mandeville to miss a half-hour of his family visit by delaying his receipt of a wheelchair. On October 5, 2002, Twining delayed Mandeville's receipt of a wheelchair for one hour and fifteen minutes of out-time.  On October 9, 2002, Corporal Stalker and C.O. May denied Mandeville a wheelchair for all but fifteen minutes of out-time.  On October 11, 2002, Mandeville was denied a wheelchair for three out of four hours of out-time.

On October 24, 2002, Mandeville was permanently assigned a wheelchair, more than six months after he first started to need the regular use of a wheelchair in order to be mobile.

11

Nevertheless, the wheelchair denials continued.  On November 8, 2002, Stalker caused Mandeville to miss forty-five minutes of a family visit by delaying access to a wheelchair.  On January 27, 2003, C.O. Unite took Mandeville's wheelchair and didn't return it until the end of out-time, which resulted in Mandeville not being able to call his family at all during that out-time.

Facts Regarding Conditions of Confinement and Harassment

Mandeville was frequently denied toilet paper, showers, and clean sheets.  On April 14, 2002, multiple officers denied Mandeville's request for toilet paper.  In late May and early June of 2002, Mandeville was denied access to a handicap shower for seven days despite repeated requests to shower.  In late June and early July, Mandeville was denied a shower for five days.  Mandeville was also denied clean sheets despite the fact that both vomiting and profuse sweating were symptoms of his illness or side-effects from his medication and, as a result, his sheets were extremely unhygienic.

On July 8, 2002, Symonds approved handicap showers at the infirmary for Mandeville, but French prevented Mandeville from using the shower, stating that his use of the shower would make the hallway too hot for Symonds.  At the end of July 2002,

12

Mandeville was denied showers for a week.  In August of 2002, Mandeville was denied showers on many occasions despite extremely hot temperatures.  From September 16 through September 19 2002, Mandeville was denied showers.

In September of 2002, clean sheets were still regularly being withheld from Mandeville.  On September 28, 2002, Mandeville requested sheets from Jardullo, claiming that his profuse sweating had caused him to have a rash.  Jardullo checked his rash, but refused to give him clean sheets, stating "Too bad. This is jail."

On October 5, 2002, Prentiss denied Mandeville clean sheets. Prentiss also refused to allow Mandeville to go to med call unless Mandeville put on both of his size 8 ½ shoes, although Mandeville had for months been wearing a shower shoe on his right foot, which had swelled to a size twelve.  Putting on his shoes caused Mandeville a great deal of pain.

On October 13, 2002, Mandeville, as was customary at the MCHC to signal that he needed privacy to use the toilet, had put up a piece of cardboard covering half his window.  C.O. Prentiss saw the cardboard and responded by opening Mandeville's door all the way so that he could be seen on the toilet by all the

inmates.  Prentiss then laughed at Mandeville and said "There is no privacy in jail."  Mandeville requested to see the shift supervisor on duty, Cpl. Mills, but Mills defended Prentiss' actions as being in accord with prison rules that inmates be required to use the toilet without privacy.

During October of 2002, Mandeville had trouble getting toilet paper when he needed it.  On December 12, 2002, C.O. Saucier denied Mandeville a shower.

On December 16, 2002, C.O. Lewko announced that Mandeville had two pieces of mail.  Lewko left Mandeville's unit, however, without giving Mandeville the mail.

In late December of 2002, Mandevile alleges that there was no heat in any of the MCHC cells, only in the adjoining day rooms.  On December 31, the heat was turned on only long enough for a maintenance worker to take readings, and then was promptly turned off for the rest of the night.  The heat remained off continuously into late January of 2003.

On January 31, 2003, at 6:00 a.m., C.O. Andrade announced over the intercom that Mandeville would have to get up, walk to, and push the intercom button in his cell to receive his meds.  On February 2, 2003, the same thing happened, and Andrade threatened

14

Mandeville with a disciplinary write-up if he did not get up and push the button.  In February and March of 2003, Mandeville was at times denied showers by Prentiss, Mayo, Unite and Jardullo.

Facts Regarding Endangerment/Failure to Protect

On July 2, 2002, Sgt. Struven called a lockdown on Mandeville's unit during out-time so that French could bring Mandeville his medication.  Struven then announced to the entire unit that the lockdown was caused by Mandeville's need to get medications.  Mandeville alleges that this announcement was designed to create animosity, hostility, and possibly even danger to Mandeville from the other inmates.  On July 3, 2002, Sgt. Jardullo did the same thing that Struven had done the day before, locking down the unit and announcing to inmates that Mandeville was to blame.

On December 23 and 24, 2002, Mandeville was in too much pain to get his medications at med call.  The correctional staff locked down the unit in order to allow the nurse to deliver the medication to Mandeville's cell.  The staff then advised the inmates that the lockdown was Mandeville's fault.

Mandeville alleges that during his stay at MCHC, as part of a pattern of torment by correctional staff, he was placed in

15

cells with undesirable inmates.  While Mandeville describes some
characteristics of his cellmates that he found undesirable, he
did not state that any of his cell mates ever harmed or
threatened to harm him in any way.

Facts Regarding the MCHC Administration's Response

Mandeville did not suffer in silence.  He attempted to bring
his complaints to Captain Croft, Superintendent Anderson and
Assistant Superintendent Doucette.  On May 22, 2002, Mandeville
met with Croft who assured him that he would no longer be
threatened with "The Hole" or a loss of medication by the medical
staff.

On August 26, 2002, Mandeville received bad news regarding
his legal situation and advised the officer on duty that he was
too upset to get his medication.  A few minutes later, the
officer advised Mandeville that Sgt. Robinson had threatened to
pepper spray Mandeville if he did not use his wheelchair to come
to med call.  Mandeville got into the wheelchair, but instead of
taking him to med call, Robinson took Mandeville to see
Superintendent Anderson regarding his complaints about the staff
tormenting him in various ways.  Anderson promised Mandeville
that the abuse would end and that she would meet with him every

16

seven to ten days.  Mandeville claims that neither promise was kept.

On September 5, 2002, Mandeville wrote to Anderson to tell her that nothing had changed.  On September 6, 2002, Mandeville met with Doucette, who also promised that Mandeville would be able to meet with Doucette or Anderson every one to two weeks. That promise was not kept.

On September 17, 2002, Mandeville again wrote to Anderson to complain about the conditions of his confinement.  On September 20, Anderson responded that Mandeville could schedule weekly shower times in the handicap shower.  Mandeville asserts that non-disabled inmates are afforded daily showers.  On September 23, 2002, Anderson authorized daily showers for Mandeville but would not authorize the use of a wheelchair for those showers on the grounds that the wheelchair could be used as a weapon, which resulted in Mandeville being unable to get to his authorized shower as he was wheelchair-bound.

Discussion

1.   <u>Claims Barred by the Statute of Limitations</u>

Congress did not provide a statute of limitations for § 1983 actions, so federal courts must borrow the personal injury

limitations period and tolling provisions of the forum state.
See Wilson v. Garcia, 471 U.S. 261, 276-80 (1985); Lopez-Gonzalez
v. Municipality of Comerio, 404 F.3d 548, 551 (1st Cir. 2005).
In New Hampshire, all personal actions, other than slander and
libel, are governed by N.H. Rev. Stat. Ann. ("RSA") 508:4 I,
which provides a three-year limitations period. See RSA 508:4 I
(Supp. 1997).  Mandeville alleges that his rights were violated
by the defendants in incidents that occurred in February and
March of 2001 regarding a head injury, scabies, and an improper
housing assignment.  This suit was not filed until March 11,
2005, approximately four years after these incidents occurred.
Because this suit was not filed within the three-year time limit
available to commence this action, I recommend that these three
claims be dismissed from the complaint.

2.    Inadequate Medical Care Claims

     To state a cause of action under § 1983 premised on
inadequate medical care, a plaintiff must allege facts which
demonstrate that the defendants acted with deliberate
indifference to his serious medical needs.  Estelle, 429 U.S. at

18

106; <u>Bean v. Cunningham</u>, 650 F. Supp. 709, 713 (D.N.H. 1986).[3]
Deliberate indifference may be manifested by prison medical
personnel in their response to a prisoner's needs or by prison
personnel "intentionally denying or delaying access to medical
care or intentionally interfering with the treatment once
prescribed."  <u>Estelle</u>, 429 U.S. at 104–05.  As to the second
essential element, "[a] medical need is 'serious' if it is one
that has been diagnosed by a physician as mandating treatment, or
one that is so obvious that even a lay person would easily
recognize the necessity for a doctor's attention."  <u>Gaudreault v.
Salem</u>, 923 F.2d 203, 208 (1st Cir. 1990).  Deprivation of medical
care constitutes cruel and unusual punishment under the Eighth
Amendment only if the indifference to an inmate's medical needs
was reckless or wanton in the criminal law sense, not merely
negligent.  <u>See</u> <u>Watson v. Canton</u>, 984 F.2d 537, 540 (1st Cir.
1993).  In order to allege that the MCHC has failed to provide
him with constitutionally adequate medical care, therefore,

---

[3]Because Mandeville was a pretrial detainee while housed at
the MCHC, the defendants' constitutional obligation to provide
him with adequate medical care flows from the Fourteenth
Amendment's Due Process Clause, rather than the Eighth
Amendment's prohibition against cruel and unusual punishment.
<u>Bell v. Wolfish</u>, 441 U.S. 520, 555 (1979).

Mandeville must allege a "deliberate indifference" to his serious medical needs.  See Consolo v. George, 58 F.3d 791, 793-95 (1st Cir. 1995) (explaining how the "deliberate indifference" to serious medical needs standard for an Eighth Amendment violation applies to pretrial detainees even though they are protected by the due process clause of the Fourteenth Amendment); Elliott v. Cheshire County, 940 F.2d 7, 10 (1st Cir. 1991) ("It is clearly established . . . that jail officials violate the due process rights of their detainees if they exhibit a deliberate indifference to the medical needs of the detainees that is tantamount to an intent to punish.") (internal citations omitted)).

Here, Mandeville has adequately described that he has a very serious medical condition, arthritis, and the pain and other symptoms attendant to the arthritis, that has been identified by medical personnel in and out of MCHC as needing significant treatment, medication and monitoring.  Mandeville has also alleged that the nursing staff at the MCHC, particularly nurses French, Poisson and Figueroa, have denied him necessary pain medication, reduced his prescribed dosages of pain medication and denied him other pain-relieving treatments.  In certain

instances, Mandeville has alleged that French actively took measures to interfere with his treatment and increase his suffering.

Mandeville also names physician's assistant Henry Symonds as a defendant to this action. Mandeville's allegations of inadequate medical treatment against Symonds, however, are limited to one instance where Symonds allegedly walked away from Mandeville when Mandeville questioned his treatment plan. In all of Mandeville's discussion of Symonds' actions toward him at the MCHC, Mandeville fails to identify any behavior on Symonds' part that would indicate that Symonds deliberately failed to provide adequate medical care for any of Mandeville's serious medical needs. Accordingly, I recommend that Symonds be dismissed from this action.

Mandeville has alleged that by failing to monitor his bone marrow levels while treating him with Methotrexate, Dr. Trice was deliberately indifferent to Mandeville's known and serious medical needs, resulting in severe anemia and blood transfusions. Therefore, in an Order issued simultaneously with this Report and Recommendation, I will direct that the inadequate medical care claim be served against French, Poisson, Figueroa, and Trice.

21

3.   <u>Inhumane Conditions of Confinement Claim</u>

To state a constitutional prison conditions violation,
Mandeville must demonstrate that he was subjected to a
deprivation that was objectively "sufficiently serious," and that
the official who caused the deprivation was "deliberately
indifferent" to his needs.  See <u>Wilson v. Seiter</u>, 501 U.S. 294,
298, 303 (1991); <u>Giroux v. Somerset County</u>, 178 F.3d 28, 32 (1st
Cir. 1999).  A challenged condition of housing may be objectively
"sufficiently serious" standing alone or in combination with
other conditions, if it deprives the inmate of an identifiable,
human need.  See <u>Wilson</u>, 501 U.S. at 304.  A prison official is
"deliberately indifferent" if he is "aware of facts from which
the inference could be drawn that a substantial risk of serious
harm exists, and also draws the inference." See <u>Farmer v.
Brennan</u>, 511 U.S. 825, 836-37 (1994).  Thus, an Eighth Amendment
claim arises only if an official inflicts "cruel and unusual
punishment" by knowing of and disregarding "an excessive risk to
inmate health or safety." <u>Id.</u> at 837, 838; <u>Giroux</u>, 178 F.3d at 32
(explaining how the official must have "an actual, subjective
appreciation of risk").  The need for humane, if not entirely
comfortable, conditions of confinement is particularly pointed

for a pretrial inmate, who is not incarcerated punitively.

Mandeville alleges that he was denied certain basic necessities of humane living: heat in the winter, regular showers, clean sheets and toilet paper. Mandeville has alleged that any prison official would know that the deprivation of these items would fall below an acceptable level of decency. He alleges that the responsible MCHC employees are Nurse French, officers Jardullo, Prentiss, Saucier, Mayo, and Unite and Superintendent Anderson. Accordingly I will direct service of the conditions of confinement claim against French, Jardullo, Prentiss, Saucier, Unite and Anderson in an Order issued simultaneously with this Report and Recommendation.

Mandeville also alleges that he was housed with undesirable inmates. I find that these allegations do not give rise to a claim that MCHC officials were aware of and deliberately indifferent to a serious risk to Mandeville's safety, and that Mandeville has not otherwise alleged sufficient facts to state a claim that placement with these roommates created unconstitutional conditions of confinement. See Street v. Fair, 918 F.2d 269, 271-72 (1st Cir. 1990) (finding no Eighth Amendment claim where plaintiff complained generally of being afraid after

a threat with no injury).  Mandeville has not cited any specific
facts or described any specific circumstances which would have
given rise to a particularized duty of the corrections officials
at the MCHC to act to prevent any of the cellmate pairings
Mandeville describes in his complaint.  Accordingly, I find that
Mandeville has failed to state a claim upon which relief may be
granted under § 1983 for being housed with undesirable inmates.

     Mandeville further alleges that defendants Struven and
Jardullo made announcements to other inmates designed to create
animosity and hositility toward Mandeville, and in doing so,
placed him in jeopardy.  Mandeville alleges that this type of
verbal harassment and endangerment entitles him to some relief
from this Court because it was intended to create a hazardous
living condition for him during his incarceration.

     The safety and security of all prisoners is protected by the
Constitution.  See e.g., Youngberg v. Romeo, 457 U.S. 307, 315
(1982).  As previously discussed, to state a constitutional
prison conditions violation, Mandeville must demonstrate that he
was subjected to a deprivation that was objectively "sufficiently
serious," and that the official who caused the deprivation was
"deliberately indifferent" to his needs.  See Wilson, 501 U.S. at

298, 303; <u>Giroux</u>, 178 F.3d at 31.  Mandeville alleges that
Struven and Jardullo acted in such a way as to place him in clear
danger of being victimized by other inmates.  Construing the
complaint liberally, it is not unreasonable to find, for purposes
of preliminary review, that the statements made by the officers,
if true, jeopardized Mandeville's safety at the MCHC.  It is also
reasonable to assume that such an effect would not only create a
serious risk to his safety, but that such risk was known to and
deliberately taken by the officers involved.  Therefore, I find
that Mandeville's inhumane conditions of confinement claim has
been sufficiently stated against Struven and Jardullo to allow it
to proceed against them at this time, and I will so direct in an
Order issued simultaneously with this Report and Recommendation.

4.   <u>Deprivation of Wheelchair Claim</u>

     Mandeville alleges that on many occasions he was confined
without access to a wheelchair after he became largely or
entirely dependent on a wheelchair for his mobility.  A
challenged condition of confinement may be objectively
"sufficiently serious" standing alone or in combination with
other conditions, if it deprives the inmate of an identifiable,
human need.  <u>See</u> <u>Wilson</u>, 501 U.S. at 304.  The ability to move

from one place to another is reasonably construed as an identifiable human need.  Although not every single deprivation of the use of a wheelchair for a limited period of time is likely to rise to the level of a constitutional violation, for purposes of preliminary review, I find that Mandeville has sufficiently stated frequent and disruptive deprivations of the use of a wheelchair by MCHC employees, Stalker, French, Struven, Prentiss, Saucier, Anderson, Twining, Mayo, Unite, and Andrade, to allow this claim to proceed against those defendants at this time, and I will so direct in the Order issued simultaneously with this Report and Recommendation.

5.   ADA Claim

     Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12132, states that no "qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  Jails and prisons are "public entities" covered by Title II of the ADA, as they fall squarely into the statutory definition which includes "any department, agency, special purpose district, or other

instrumentality of a State or States or local government." <u>See</u>
<u>Pa. Dep't of Corr. v. Yeskey</u>, 524 U.S. 206, 209–10 (1998).  The
provision of a means of mobility, showers, phone and personal
visits with loved ones, and access to phone calls with one's
attorney are, arguably, "benefits" or "services" of a jail.
Mandeville has alleged that he is disabled and that he has been
deprived of these benefits and services by virtue of his
disability.  Construing these assertions as true, I find that
Mandeville has alleged the necessary elements of an ADA claim
against defendants Stalker, French, Struven, Prentiss, Saucier,
Anderson, Twining, Mayo, Unite, Andrade, Jardullo, and Anderson
and I will direct that it proceed against them in the Order
issued simultaneously with this Report and Recommendation.

6.   <u>Harassment and Abuse Claims</u>

     Mandeville alleges that he was subject to a pattern of
abuses that were designed to harass and torment him.  Mandeville
does not identify any reason why the correctional staff might be
particularly hostile to him.  In general, nonphysical abuse or
harassment does not invoke constitutional protection.  <u>See</u>
<u>Shabazz v. Cole</u>, 69 F. Supp. 2d 177, 198–201 (D.Mass. 1999)
(citing authority to explain that racial slurs and verbal threats

27

do not violate a prisoner's constitutional rights).  Accordingly,
to the extent that Mandeville attempts to state a claim based on
his subjection to general abuse and harassment, I recommend the
claim be dismissed.  It further appears that Mandeville is
attempting to state a claim under the Equal Protection Clause of
the Fourteenth Amendment, implying that the harassment was the
result of his status as an inmate with a disability.  Isolated
instances of name-calling and verbal harassment, by themselves,
will not support an equal protection claim.  See DeWalt v.
Carter, 224 F.3d 607, 612 (7th Cir. 1999).  Thus, even presuming
that the facts Mandeville alleges are true, these assertions,
while describing unprofessional and reprehensible conduct on the
part of the offending officers, fail to establish an Equal
Protection violation.  Accordingly, I recommend that both the
Equal Protection and generalized harassment claims raised by
Mandeville be dismissed.

7.   Mail Claim

     Mandeville has alleged that on one occasion his mail was
withheld from him by Officer Lewko at the MCHC.  Even assuming
that Lewko was responsible for the failure to see that two pieces
of mail reached Mandeville's hands, Mandeville has stated neither

28

how he was damaged by this action nor that the incident was more than a unique error.  I cannot from the facts presented, find any reason to conclude that this act was in any way malicious or deliberate.  Accordingly, I recommend that this claim and defendant Lewko be dismissed from this action.

8.   <u>Family Visits and Phone Contact</u>

Mandeville alleges that some of the incidents wherein he was deprived of a wheelchair caused him to miss portions of family visits or to be unable to call his family during certain out-times.  To the extent that these are claims of general deprivation of a wheelchair, I have found, above, that those claims are able to proceed at this time.  It appears that Mandeville may have also intended to raise these issues as a claim for the denial of contact with his family in violation of the First Amendment and his right to intimate association.  <u>See</u> <u>Roberts v. U.S. Jaycees</u>, 468 U.S. 609, 617–18 (1984).  Although associational rights are "the most obvious of the First Amendment rights that are necessarily curtailed by confinement," <u>see</u> <u>Jones v. N.C. Prisoners' Labor Union, Inc.</u>, 433 U.S. 119, 125 (1977), pretrial detainees have been recognized as having a First Amendment right to some telephone access.  <u>See e.g.</u>, <u>Coronel v.</u>

29

Hawaii, 993 F.2d 882, 883 (9th Cir. 1993).

In discussing the issue of visitational association with family members, the First Circuit has stated:

> For detainees to receive visits at regular intervals from loved ones and friends is a commonly accepted privilege; . . . and implicates, in the case of detainees especially, communicative as well as associational values protected by the first amendment.  A refusal, therefore, to allow the ordinary detainee any visitation privileges or the laying down of capricious limitations not justified by considerations of jail security and order, would be unconstitutional.

Feeley v. Sampson, 570 F.2d 364, 372 (1st Cir. 1978) (citing Procunier v. Martinez, 416 U.S. 396, 411–12 (1974)).  Although the Court in Feeley declined to decide definitively that a detainee maintained an absolute constitutional right to use the telephone to contact his immediate family, it acknowledged that among courts applying the appropriate standard of review to the issue "the consensus has been in favor of at least some access." Id. at 374 (collecting cases).

While Mandeville has alleged that on two occasions he was denied a portion of his family visit, and that on one occasion he was not able to call his family because no wheelchair was provided to him during out-time, Mandeville's allegations fall short of identifying a violation of his constitutional right to

30

intimate association.  Mandeville does not state that he was
denied visits for any significant length of time or even that he
was ever denied an entire visit.  And causing Mandeville to miss
one opportunity to place a phone call to his family cannot be
construed as sufficiently egregious to constitute a violation of
Mandeville's constitutional right of association.  I therefore
recommend that this claim be dismissed.

9.   Right of Access to the Courts

Mandeville alleges that on two occasions he was denied the
ability to speak with his attorney by phone.  Mandeville fails to
name any defendant responsible for this deprivation.  Further, to
the extent that Mandeville intended to assert a denial of his
access to the courts occasioned by the inability to speak to his
attorney, he has failed to state any way in which his legal
status was harmed by that deprivation, which is a necessary
showing to state such a claim.  Lewis v. Casey, 518 U.S. 343, 351
(1996).  Accordingly, I recommend that any intended claim of a
violation of Mandeville's right to access the courts be dimissed.

10.  Supervisory Liability

Mandeville has named MCHC Superintendent Carole Anderson,
MCHC Deputy Superintendent Richard Doucette and MCHC Captain

Croft as defendants to this suit.  Mandeville has alleged that
these three MCHC supervisors were fully informed of the
difficulties Mandeville encountered at the MCHC and assured
Mandeville that they were in a position to dispossess him of
those difficulties.  I assume that in addition to Anderson's
specific deprivation of the means to obtain daily showers,
Mandeville intends to sue these individuals in their supervisory
capacities.  "Supervisory liability under § 1983 cannot be
predicated on a *respondeat* theory, but only on the basis of the
supervisor's own acts or omissions."  Matos v. Toledo Davila, 135
F.3d 182, 192 (1st Cir. 1998).  A supervisor must be "either a
primary actor involved in, or a prime mover behind, the
underlying violation."  Camilo-Robles v. Zapata, 175 F.3d 41, 43-
44 (1999).  There must be "an affirmative link, whether through
direct participation or through conduct that amounts to
condonation or tacit authorization" to the violation alleged.
Id. at 44.  Here, Mandeville's claims suffice to allege that the
supervisors in question were aware of the violations Mandeville
alleges, had the authority and ability to stop those violations
and deprivations, and did little or nothing to prevent them.
Accordingly, I find that this complaint has sufficiently stated

claims against Anderson, Doucette and Croft in their supervisory capacities to allow this action to proceed against them.

Conclusion

For the reasons explained herein, I recommend dismissal of the undesirable cellmate, harassment, Equal Protection, deprivation of mail, right of intimate association, and right of access to the courts claims, as well as defendants Symonds and Lewko, from this action.  In an Order issued simultaneously with this Report and Recommendation, I allow the inadequate medical care claim to be served on defendants French, Poisson, Figueroa, and Dr. Trice, the inhumane conditions of confinement claims to be served on defendants French, Jardullo, Prentiss, Saucier, Mayo, Unite, and Anderson, the endangerment claim to be served on defendants Struven and Jardullo, the denial of a wheelchair claim to be served on defendants Stalker, French, Struven, prentiss, Saucier, Anderson, Twining, Mayo, Unite, and Andrade, and the ADA claim to be served on defendants Stalker, French, Struven, Prentiss, Saucier, Anderson, Twining, Mayo, Uniet, Andrade, Jardullo, and Anderson.  Further I will direct that defendants Croft, Anderson, and Doucette be served with all of the approved

33

claims in their supervisory capacities.  See 28 U.S.C. §
1915A(b)(1).

If this recommendation is approved, the claims as identified
in this Report and Recommendation, will be considered for all
purposes to be the claims raised in the complaint.  If the
plaintiff disagrees with the identification of the claims herein,
he must do so by objection filed within ten (10) days of receipt
of this Report and Recommendation, or he must properly move to
amend the complaint.

Any objections to this Report and Recommendation must be
filed within ten (10) days of receipt of this notice.  Failure to
file objections within the specified time waives the right to
appeal the district court's order.  See Unauthorized Practice of
Law Comm. v. Gordon, 979 F.2d 11, 13–14 (1st Cir. 1992); United
States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).


_____
James R. Muirhead
United States Magistrate Judge

Date:      July 21, 2005

cc:        Mark Mandeville, *pro se*