UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>Mark R. Mandeville</u>


     v.                               Civil No. 05-cv-92-JD
                                          Opinion No. 2008 DNH 107

<u>Merrimack County Department</u>
<u>of Corrections, et al.</u>


<u>O R D E R</u>

Mark Mandeville brings a claim under Title II of the
Americans with Disabilities Act ("ADA") against the Merrimack
County Department of Corrections ("MCDC") and claims under the
Civil Rights Act, 42 U.S.C. § 1983, against MCDC current and
former employees and its superintendent, challenging the
conditions of his confinement at the Merrimack County House of
Corrections as a pretrial detainee.  Carol French, who was a
nurse at the jail during Mandeville's confinement there, moves
for partial summary judgment on the claims against her.  The MCDC
defendants move for summary judgment on the claims against them.
Mandeville objects to both motions.


<u>Standard of Review</u>

Summary judgment is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c).  The party seeking summary judgment must first demonstrate
the absence of a genuine issue of material fact in the record.
See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A party
opposing a properly supported motion for summary judgment must
present competent evidence of record that shows a genuine issue
for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
256 (1986).  All reasonable inferences and all credibility issues
are resolved in favor of the nonmoving party.  See id. at 255.

I.  French's Motion for Partial Summary Judgment

     As construed by the magistrate judge, Mandeville alleges a
medical claim and two unconstitutional conditions of confinement
claims under § 1983 against French.  He contends that French was
deliberately indifferent to his serious medical needs as
demonstrated by a series of incidents between April and September
of 2002.[1]  He also contends that French subjected him to

_____

     [1]In support of his objection, Mandeville submitted his
affidavit and selected portions of notes he made while he was
housed at MCDC.  Mandeville refers to his notes as his "log."
Mandeville states in his affidavit that the log is true to the
"best of his knowledge and belief."  The log is accepted as
competent evidence under Rule 56(e) to the extent it is based on

unconstitutionally inhumane conditions of confinement by denying
him use of a handicap shower and a wheelchair.  French moves for
summary judgment as to part of Mandeville's medical claim and his
conditions of confinement claim.


    A.  <u>Serious Medical Need</u>

    As a pretrial detainee, Mandeville was entitled to at least
as much protection under the Fourteenth Amendment as convicted
prisoners are afforded under the Eighth Amendment.  <u>Bell v.
Wolfish</u>, 441 U.S. 520, 545 (1979).  "For medical treatment in
prison to offend the Constitution, the care must involve acts or
omissions sufficiently harmful to evidence deliberate
indifference to serious medical needs."  <u>Ruiz-Rosa v. Rullan</u>, 485
F.3d 150, 156 (1st Cir. 2007) (internal quotation marks omitted).
Deliberate indifference means that the prison employee
"subjectively must both be aware of facts from which the
inference could be drawn that a substantial risk of serious harm
exits, and [s]he must also draw the inference."  <u>Id.</u> (internal
quotation marks omitted).  Examples of deliberate indifference
include denying needed care as punishment and making medical care

────────────────

Mandeville's personal knowledge of the events he describes.

3

decisions recklessly with actual knowledge of potential harm that
could be easily prevented.  Id.

At least for purposes of summary judgment, French does not
dispute that Mandeville was suffering from a serious medical
condition, psoriatic arthritis, during the time in question.  The
record also establishes that Mandeville was prescribed a variety
of treatments for his condition and the pain it caused.  To
support her motion, French parses through the incidents that
Mandeville has cited, which involve her refusals to provide
Mandeville with prescribed medication and with hot packs for his
pain.  She argues on some occasions she did not show deliberate
indifference to Mandeville's medical needs.  Notably, French does
not seek summary judgment to the extent the medical claim is
based on an incident on May 15, 2002, during which Mandeville
contends French first forced him to crawl to get his medications,
then refused to give him his medications, and demanded that he
stand and walk in order to receive his medications, which he was
only barely able to do.[2]

Mandeville's claim is that French's treatment of him, taken
as a whole, showed that she was deliberately indifferent to his

---

[2]Mandeville's description of that incident is corroborated
by the deposition testimony of the corrections officer on duty
who witnessed French's actions.  Following an investigation,
French was disciplined for her treatment of Mandeville.

4

serious medical needs, in violation of the Constitution.  Whether the individual incidents he cites would constitute separate constitutional violations is not material to the claim.  Instead, French's treatment of Mandeville, taken as a whole and with inferences drawn in a light most favorable to Mandeville, demonstrates a material factual issue as to whether French acted with deliberate indifference to Mandeville's serious medical needs.  Therefore, the record presented does not support summary judgment in French's favor on the medical claim.[3]

B.  Conditions of Confinement

Mandeville contends that French imposed unconstitutional conditions of confinement by preventing him from using a handicap equipped shower and a wheelchair.  French responds that the incidents Mandeville cites are not sufficient to show inhumane conditions or prove the claim.

A pretrial detainee's claim of unconstitutional conditions of confinement arises under the Fourteenth Amendment, which provides protections that are coextensive with the Eighth

---

[3]French also argues that Mandeville cannot prove deliberate indifference without an expert witness.  French's theory is based on the requirements for proving medical negligence under state law, which is not relevant to a deliberate indifference claim. See Ruiz, 485 F.3d at 156.

Amendment.  Surprenant v. Rivas, 424 F.3d 5, 18 (1st Cir. 2005).
The Fourteenth Amendment prohibits punishment of pretrial
detainees.  Id. at 13.  A restriction on a pretrial detainee that
serves no legitimate governmental purpose constitutes punishment
and is barred by the Fourteenth Amendment.  Id.  To succeed on a
claim of unconstitutional conditions of confinement, a plaintiff
must prove "from an objective standpoint, the conditions of his
confinement deny him the minimal measure of necessities required
for civilized living . . . [and] that, from a subjective
standpoint, the defendant was deliberately indifferent to inmate
health or safety."  Id. at 18-19.  In this context, deliberate
indifference "is a mental state akin to criminal recklessness."
Id. at 19.

     1.  Wheelchair

     Mandeville contends that his log shows that he was regularly
denied access to a wheelchair which caused him to be confined in
his cell twenty-four hours a day and to miss other activities.
French focuses on one incident, which occurred on June 27, 2002,
and argues that it is insufficient to show a constitutional
violation.  Although Mandeville cites multiple incidents
chronicled in his log, the only wheelchair incidents involving
French occurred on May 15 and June 27, 2002.

On May 15, French was dispensing medications from a cart in Mandeville's unit.  Mandeville was prescribed pain medication, which would be dispensed from the cart.  Although Mandeville had asked for a wheelchair before the time for dispensing medications, none was provided.  Mandeville crawled out of his cell to the cart, but French refused to give him medication until he could stand up.  He was transported to the medical department in a wheelchair.  Once there, French told him that if he could not stand and walk to get his medications, he would be transferred to a housing unit that the inmates refer to as "the hole."  To avoid that outcome, Mandeville stood and walked to French to get his medications, despite the pain it caused.

That incident alone raises a factual issue as to French's deliberate indifference to Mandeville's health and safety. Forcing Mandeville to walk rather than use a wheelchair under those circumstances raises a factual issue as to whether she denied him the minimal necessities for civilized living.  The June 27 incident is not well developed, but following the May 15 incident, French's actions on June 27 add proof of her indifference to Mandeville's health and safety.

7

2. Shower

Mandeville contends that French interfered with his access
to the handicap shower, which was located on a tier below
Mandeville's unit, in the medical department.  Because of its
location, Mandeville required staff assistance to get to the
shower.  French states that she instructed the jail staff not to
take Mandeville to the shower when the physician's assistant
("P.A") was in his office because the P.A. wanted to protect
patient confidentiality and avoid being "monopolized" by
Mandeville.[4]

Mandeville's notes in his log demonstrate an ongoing
struggle between Mandeville and the staff about showering.  The
log shows that Mandeville regularly went for three or more days
between showers.  The log states that on July 8, Mandeville had
arranged for a shower but when he got down to the handicap shower
area, French said that he could not use the shower at that time
because the heat from the shower would disturb the P.A.
Mandeville wrote that he had told the P.A. that he was going to
take a shower and he responded, "that's good."  Because French
refused to let him use the handicap shower, Mandeville wrote: "So

---

[4]French did not provide the physician's assistant's
affidavit or any other evidence to support her instruction to the
jail staff to restrict Mandeville's access to the shower.

I may not get a shower again today, which would make the 4th or 5th day."

On September 20, 2002, Mandeville had not showered for five days and asked repeatedly for a shower. Finally, a corrections officer agreed to take him to the handicap shower. Mandeville wrote in his log that French "complained to C.O. Saucier that my taking a shower near P.A. call was making the hallway hot and uncomfortable for Henry the P.A. during P.A. call never mind my not having taken a shower in five days!"

Based on the record evidence, French interfered with Mandeville's access to the only shower he could use by instructing the staff not to allow him to shower when the P.A. was in his office. She has not supported her edict with any evidence that it was necessary or even authorized by the P.A. or any other supervisor at the jail. French also interfered with Mandeville's showers in particular incidents on July 8 and September 20. The record shows that Mandeville often went multiple days and even a week at a time between showers. Although this claim is not well-developed, a factual issue remains as to whether French was deliberately indifferent to Mandeville's health or safety and whether her actions deprived Mandeville of "the minimal measure of necessities required for civilized living." Surprenant, 424 F.3d at 18.

9

II.  <u>MCDC Defendants' Motion for Summary Judgment</u>

Mandeville's claims against the MCDC defendants are that MCDC violated Title II of the ADA by failing to provide him consistent access to a wheelchair and a handicap accessible shower and that MCDC and the individual defendants imposed inhumane conditions of confinement with deliberate indifference to his health and safety in violation of the Fourteenth Amendment.  MCDC moves for summary judgment on the ADA claim, contending that the ADA does not apply because it does not receive federal funding, that it is entitled to qualified immunity, and that no ADA violation occurred.  MCDC and the individual defendants seek summary judgment on Mandeville's conditions of confinement claim on the grounds that some of his complaints are barred by the exhaustion requirement of the Prisoner Litigation Reform Act ("PLRA"), that the conditions he describes were not unconstitutional, and qualified immunity.

A.  <u>ADA Claim</u>

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. §

10

12132.  For purposes of the Act, a "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  § 12131(2).  A "public entity" includes a local government and "any department, agency, . . . or other instrumentality of a . . . local government."  § 12131(1).  Title II of the ADA provides a private cause of action for damages against public entities that violate its provisions.  <u>United States v. Georgia</u>, 546 U.S. 151, 153 (2006).

### 1.  Federal Funding

MCDC asserts that it cannot be liable for any ADA violation because it does not receive federal funds.  MCDC cites no legal authority for that theory.  In his objection, Mandeville pointed out the lack of support for MCDC's federal funding defense, but MCDC failed to address that deficit in its reply.  The court finds no legal support for this defense.  <u>See</u> <u>Pierce v. County of Orange</u>, --- F.3d ---, 2008 WL 2052508, at *20 n.27 (9th Cir. May 15, 2008) ("Title II of the ADA was expressly modeled after § 504 of the Rehabilitation Act of 1973 . . . and essentially extends

coverage to state and local governmental entities that do not receive federal funds."); cf. Neighborhood Ass'n of The Back Bay, Inc. v. Fed. Transit Admin., 463 F.3d 50, 53 (1st Cir. 2006) (discussing obligations of public transit authorities in receiving federal funding for ADA compliance).

### 2.  Qualified Immunity

MCDC also asserts that it is entitled to qualified immunity from liability under the ADA.  It is not.  As the court previously held in this case, Title II of the ADA applies only to public entities, not individual defendants.  See Order, Aug. 22, 2007.  In contrast, qualified immunity protects only individual defendants, not public entities such as MCDC.  Owen v. City of Independence, 445 U.S. 622, 650 (1980); accord Tardiff v. Knox County, 365 F.3d 1, 2 (1st Cir. 2004).  Therefore, MCDC is not entitled to the defense of qualified immunity.

### 3.  Merits

To succeed on his ADA claim, Mandeville must prove:

(1) that he [was] a qualified individual with a
disability; (2) that he was either excluded from
participation in or denied the benefits of [MCDC's]
services, programs, or activities or was otherwise
discriminated against; and (3) that such exclusion,
denial of benefits, or discrimination was by reason of
[his] disability.

Buchanan v. Maine, 469 F.3d at 158, 170-71 (1st Cir. 2006)
(internal quotation marks omitted).  Mandeville asserts that MCDC
violated the ADA by failing to provide him a wheelchair and
consistent access to a handicap equipped shower, which he needed.
Although far from clear, it appears that the MCDC asserts for
purposes of summary judgment that Mandeville cannot prove that he
needed a wheelchair to accommodate his disability or that he was
denied access to the handicap equipped shower.

As is noted above, Mandeville was ill with psoriatic
arthritis while he was detained at MCDC.  A consultation note
written by Dr. James Trice on May 22, 2002, states that
Mandeville began having significant problems with joint pain and
swelling along with a low grade fever for two to three months
before that appointment.  Dr. Trice noted that Mandeville was in
a wheelchair, that several joints showed swelling including his
knees, his right ankle and foot, and his right elbow.  His skin
had areas of redness and scale that were consistent with
psoriasis and his nails showed significant psoriatic changes.
Dr. Trice diagnosed psoriatic arthritis.

Carole Anderson, who was superintendent of MCDC during the
time Mandeville was detained there, had seen his swollen legs and
feet in May of 2002 and was aware that he needed a wheelchair.

Anderson testified at her deposition that her "first thought" was
to give Mandeville a wheelchair, but she then decided that it
would be a security risk.  As a result, Mandeville had to request
a wheelchair from a corrections officer any time that he needed
to move outside of his cell.  That system did not work well
because the staff did not have time to respond to Mandeville's
requests with the other demands on their time and attention.  At
the end of October of 2002, although the circumstances had not
changed, Anderson allowed Mandeville to have a wheelchair in his
cell.  Mandeville recorded in his log during the summer and fall
of 2002, that at times staff ordered his wheelchair to be taken
away and at other times he missed opportunities to get out of his
cell, to talk on the telephone with his attorney, and to visit
with his family.

        Mandeville contends that because of medications he took, he
was prone to sweating more than other inmates and also had
problems with his skin, which caused him to need regular showers.
He also needed a handicap accessible shower which was located in
the medical area of the jail.  His log documents that he often
waited for four to seven days between showers.  In late September
of 2002, Anderson ordered that Mandeville be allowed to shower
each evening at 6:00 pm when he was in the medical area to
receive his medications.

14

a.  <u>Use of a Wheelchair</u>

Mandeville contends that he was a qualified person with a disability caused by his illness, psoriatic arthritis, and that MCDC failed to provide him with a wheelchair, except on a sporadic basis, which restricted his ability to leave his cell as other non-disabled inmates were able to do.  MCDC responds that it is entitled to summary judgment because, as in <u>Kiman v. N.H. Dep't of Corrs.</u>, 451 F.3d 274 (1st Cir. 2006) and unpublished decisions from the Sixth and Eighth Circuits, Mandeville's disability was not readily apparent to corrections officials, a wheelchair was sometimes provided to Mandeville, Mandeville cannot show that jail staff knowingly prevented him from using a wheelchair, and isolated instances of missing services or privileges do not violate the ADA.

It is undisputed that Mandeville's illness and its effects on his mobility were obvious and well-known to the officials and staff of MCDC by mid-May of 2002.  It is also undisputed, based on Anderson's deposition testimony, that Mandeville needed to use a wheelchair to make use of his out-of-cell time at least beginning in mid-May of 2002.  It is also undisputed that Mandeville was given limited access to a wheelchair during this time period and that the lack of access prevented him from leaving his cell.

15

For purposes of Title II of the ADA, "[g]enerally, public entities must 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of a disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the of the service, program, or activity.'"  <u>Pierce</u>, 2008 WL 2052408 at *19 (quoting 28 C.F.R. § 35.130(b)(7)).  Although MCDC suggests that security concerns prevented them from giving Mandeville a wheelchair in his cell, that argument is not well-developed.  In addition, based on the present record, MCDC then changed its policy and made a wheelchair available without any change in circumstances that would ameliorate security concerns.

MCDC has not shown that based on undisputed facts it is entitled to summary judgment on Mandeville's ADA claim that he was denied access to a wheelchair.

### b.  Shower

A similar situation apparently existed with respect to Mandeville's access to the handicap accessible shower.  No dispute exists that Mandeville needed to use a handicap accessible shower.  Such a shower existed, but it was located on the first floor of the jail in the medical area so that

16

Mandeville needed MCDC staff assistance to get to the shower. Because the staff often did not have time or inclination to take Mandeville to the shower, he frequently went days or even a week between showers.  That does not appear to have been the ordinary schedule for showers in the jail.  Therefore, a triable issue exists as to whether, because of his disability, Mandeville was denied access to services available to other inmates.

B.  Inhumane Conditions of Confinement

As is discussed in Part I, to succeed on his claim of unconstitutional conditions of confinement, Mandeville must prove "from an objective standpoint, the conditions of his confinement deny him the minimal measure of necessities required for civilized living . . . [and] that, from a subjective standpoint, the defendant was deliberately indifferent to inmate health or safety."  Surprenant, 424 F.3d at 18–19.  In this context, deliberate indifference "is a mental state akin to criminal recklessness."  Id. at 19.  Separate conditions that have a reinforcing effect, such as cold cell temperatures and a lack of clothing or blankets, are considered in combination while unrelated conditions are addressed separately.  Wilson v. Seiter, 501 U.S. 294, 304–05 (1991).

17

Mandeville contends that certain MCDC employees subjected him to unconstitutional conditions of confinement by depriving him of consistent use of a wheelchair, by refusing to provide regular access to the handicap shower, by subjecting him to cold temperatures in his cell, by leaving soiled sheets on his bed, and by refusing to provide toilet paper.  Mandeville brings his conditions of confinement claims against Don Andrade, Marc Jardullo, Brian Prentice, Joseph Saucier, Dawn Twining, and Larry Untiet.  He also brings a conditions of confinement claim against Anderson as the supervisor of MCDC while he was detained there. The defendants move for summary judgment on the grounds that Mandeville cannot show that he was subjected to inhumane conditions or that the defendants were deliberately indifferent to his needs, that he cannot prove a retaliation claim,[5] that he failed to exhaust his claim based on the denial of toilet paper, and qualified immunity.

---

[5]The claim referred to as a retaliation claim was brought against Corrections Officers Jardullo and Struven.  Mandeville alleged that they called a lock down in his unit in order to administer his medications and announced to the unit that the lock down was Mandeville's fault.  Mandeville alleged that the purpose of the announcement was to create animosity and hostility against him and possibly to endanger him.  Mandeville has dismissed all claims against Struven and has not pursued that claim against Jardullo.  Therefore, that claim is deemed to be waived.

### 1. Individual Defendants

Mandeville does not address his conditions of confinement claims against the individual MCDC officers separately. He relies on a summary of his log as his statement of material facts. The log summary, however, provides few references to individual defendants.

### a. Wheelchair

Although the log summary demonstrates repeated requests for a wheelchair, most of the notations do not indicate which defendant was responsible. The log states that on July 3, 2002, Jardullo ordered that Mandeville would not have use of a wheelchair. On September 11, 2002, Prentice took the wheelchair from Mandeville after he had it for forty minutes. On September 19, Saucier denied Mandeville use of a wheelchair for two and a half hours because he was busy and forgot. On September 24, Prentice took the wheelchair away from Mandeville while he was waiting in the line for medications. On September 27, Twining got the wheelchair to Mandeville two hours late leaving only one hour of time outside of his cell. On January 27, Untiet brought Mandeville his wheelchair after others had previously taken it away. As to each officer named, the incidents cited in the log

19

are insufficient to show that the officer created an
unconstitutional condition.

### b.  Showers, Sheets, and Toilet Paper

Arguably, Mandeville's claims about the lack of showers,
clean sheets, and toilet paper all relate to personal hygiene and
should be considered in combination.  See Wilson, 501 U.S. at
305.  Again, however, few of the complaints are linked to
specific defendants.

On August 12, Prentice told Mandeville he was too busy to
take him to the shower, although Mandeville had gone four days
without a shower.  On September 4 and 5, Mandeville asked
Jardullo for a shower, after waiting two days, and Jardullo at
first refused because he was busy and then got Mandeville to the
shower at 6 p.m. on September 5.  On September 19, Prentice again
refused to take Mandeville to the shower after four days without
showering.  Mandeville asked three different officers for a
shower on September 20, including Twining, and "someone" got him
a shower.  Despite an arrangement for taking showers in the
evening when he was given his medications, Mandeville noted that
on February 15, 2003, Prentice denied him a shower and again on
February 27.

According to his log, Prentice and Jardullo denied
Mandeville's requests for clean sheets for a little more than a
week at the end of September and beginning of October.  The
toilet paper problems occurred once in April of 2002, again in
October and then in December of 2002, on several occasions in
January of 2003, and once in February.  No defendant is named as
being responsible for denying toilet paper.[6]  Even taken as a
whole, the deprivations of showers and sheets, as assigned to
individual defendants, are insufficient to support Mandeville's
claim of unconstitutional conditions of confinement.

### c.  Cold Cell

Mandeville contends that the staff kept the heat too low in
the cell area so that he was cold.  His log notes that he was too
cold on seven occasions between the end of December of 2002 and
mid-February of 2003.  Mandeville does not name an individual
defendant in any notes related to cell temperature or controlling
the heat.  Therefore, he has not shown that any of the named
defendants were deliberately indifferent to his health or safety
by keeping the heat too low.

---

[6]The MCDC defendants also contend that Mandeville failed to
exhaust his remedies on his toilet paper claim as required by 42
U.S.C. § 1997e.  Because that claim is resolved on other grounds,
the issue of exhaustion is not addressed.

2.  Supervisory Liability

Mandeville contends that Anderson is liable for inhumane conditions he experienced due to the lack of access to a wheelchair and a handicap accessible shower.  Although a supervisor cannot be held vicariously liable under § 1983 for the actions of her subordinates, a supervisor may be liable for her own actions or omissions.  Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005).  A supervisor also is liable "if (1)[a] subordinate commits a constitutional violation, and (2) the supervisor's actions are affirmatively linked to the behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence," or gross negligence that amounts to deliberate indifference.  Hatfield-Bermudez v. Aldanondo-Rivera, 496 F.3d 51, 61 (1st Cir. 2007) (internal quotation marks omitted).  A supervisor must be "either a primary actor involved in, or a prime mover behind, the underlying violation."  Camilo-Robles v. Zapata, 175 F.3d 41, 43-44 (1st Cir. 1999).

a.  French

A factual issue remains as to whether French's treatment of Mandeville was unconstitutional.  Anderson would be liable for

such a violation if she encouraged, condoned, or acquiesced in French's actions or if she were deliberately indifferent to what French was doing.  The record does not show that to be the case.

When Anderson was notified about the May 15 incident involving Mandeville and French, she began an investigation.  She disciplined French based on the results of the investigation. The record does not show that Anderson was aware of French's instruction to the staff not to allow Mandeville to shower when the physician's assistant was in his office or her interference with his showers or his use of a wheelchair on specific days. Anderson directed the staff to get the wheelchair for Mandeville's use and to get him to the handicap shower.  Although Anderson's directions may not have been strictly followed and may have been ineffective in getting Mandeville showers and access to the wheelchair, the record does not show that Anderson was directly linked to French's actions.

### b.  Direct Actions

While inhumane conditions alone do not violate the constitution, prison officials cannot confine inmates in inhumane conditions with deliberate indifference to the inmates' health or safety.  Farmer v. Brennan, 511 U.S. 825, 837–38 (1994).  A prison official is deliberately indifferent to an excessive risk

to an inmate's health or safety if the official "knows of and disregards an excessive risk to inmate health or safety."  Id. at 837.  Prison officials are not deliberately indifferent "if they responded reasonably to the risk, even if the harm ultimately was not avoided."  Burrell v. Hampshire County, 307 F.3d 1, 8 (1st Cir. 2002).

It is undisputed that Anderson was aware from at least May 15, 2002, that Mandeville needed a wheelchair for mobility.  The record is less clear as to when Anderson first became aware that Mandeville needed access to the handicap shower.  Anderson does not dispute that access to a wheelchair and to the shower were necessary for Mandeville's health and safety.  Instead, she contends that she responded to his needs as best she could under the circumstances.  The circumstances that affected her actions included having only one wheelchair for the entire jail, having only one handicap shower located in the medical department on a lower tier, security concerns about inmates having access to a wheelchair which could provide sharp parts to be used as weapons, and limited staffing available to transport Mandeville to the shower and to get the wheelchair.  Anderson arranged for Mandeville to have regular showers starting at the end of September by coordinating his showers with his medication.  By

the end of October, Anderson changed her policy and allowed
Mandeville to keep a wheelchair in his cell.

The record shows that Anderson did not ignore Mandeville's
need to use a wheelchair and the handicap shower.  Instead, she
established policies and procedures for providing that access,
although her efforts were not entirely successful.  Mandeville
notified Anderson that despite her orders, the wheelchair often
arrived late which resulted in his missing out of cell time,
telephone calls, and other opportunities that were accessible to
him only by using a wheelchair.  He also went for days without
showering because the staff was unable to get him to the handicap
equipped shower.  The record shows that Anderson continued to
remind her staff of their obligations to get a wheelchair to
Mandeville and to get him to the shower.  After several months of
limited success, Anderson changed her policies and allowed
Mandeville to keep the wheelchair in his cell and to shower on a
regular schedule.

That sequence of events does not show a factual dispute as
to whether Anderson was deliberately indifferent to Mandeville's
needs.  Although Anderson might have done more, she nevertheless
was attentive to Mandeville's complaints.  See Navedo v. Maloney,
172 F. Supp. 2d 276, 285 (D. Mass. 2001).  Therefore, Anderson is

25

entitled to summary judgment on Mandeville's claim that she subjected him to unconditional conditions of confinement.

## Conclusion

For the foregoing reasons, defendant French's motion for partial summary judgment (document no. 93) is denied.  The MCDC defendants' motion for summary judgment (document no. 94) is denied as to the ADA claim and is otherwise granted.  The claims remaining in this case are that Carol French acted with deliberate indifference to Mandeville's serious medical needs, that she acted with deliberate indifference to a serious risk to his health and safety by subjecting him to inhumane conditions, and that MCDC violated Title II of the ADA.


SO ORDERED.


_Joseph A. DiClerico, Jr._
Joseph A. DiClerico, Jr.
United States District Judge

May 21, 2008

cc:  W. Kirk Abbott, Jr., Esquire
     Charles P. Bauer, Esquire
     John A. Curran, Esquire
     Elizabeth L. Hurley, Esquire
     Lisa Lee, Esquire
     Daniel J. Mullen, Esquire
     Michael J. Sheehan, Esquire

26